2015 UT App 195

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ATHIMBAYO ALEH,
Appellant.

Opinion
No. 20140178-CA
Filed August 6, 2015

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 101905210

Anthony V. Rippa, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and STEPHEN L. ROTH concurred.

VOROS, Judge:

¶1　A jury convicted Athimbayo Aleh of robbery and theft, second degree felonies, and assault, unlawful detention, and sexual solicitation, class B misdemeanors. Aleh appeals. We affirm.

## BACKGROUND[1]

### *Waiver of Preliminary Hearing*

¶2    At a roll-call hearing, Aleh's original counsel stated that Aleh intended to waive his preliminary hearing. The court asked whether counsel had explained to Aleh what the waiver meant and what it entailed. Counsel responded that he had. Specifically, counsel explained to Aleh "that he has the right to have a preliminary hearing," that the State has the burden of establishing by a probable cause standard that Aleh committed the charged crimes, and "that he would be waiving just the right to that preliminary hearing in anticipation of accepting an offer that's being extended by the State." The court then asked Aleh whether he was prepared to waive his right to a preliminary hearing. Aleh responded, "Yes, Sir." When the court asked whether he had any questions Aleh responded, "Yes. Okay. No questions." The court bound Aleh over on all charges.

¶3    However, the statements of the court and counsel at the roll-call hearing confused Aleh "as to the bindover and the charges in the case." Aleh apparently believed that when he waived his preliminary hearing, the court would bind him over on the three misdemeanors only and that the felonies would be dismissed. Aleh's confusion surrounding the dismissal of the felonies was understandable. At the roll-call hearing, the State acknowledged that due to "some legal issues on the first two [felony] counts . . . the State would have a very difficult time proving" those counts. And the court stated, "So, the bind over is with the three misdemeanor counts only, is that correct?" The

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations and internal quotation marks omitted).

State and Aleh's counsel agreed. However, the court clerk asked, "Do you want me just to bind everything over to [Judge] Barrett and, then, from there, go to the misdemeanor? . . . So, he can dismiss on it?" The court, the State, and Aleh's counsel all agreed. The court bound Aleh over on all charges.

¶4 Represented by new counsel, Aleh moved to set aside his waiver of the preliminary hearing. The court denied Aleh's motion on the ground that Aleh had knowingly and voluntarily waived his right to a preliminary hearing. The court found that Aleh's original counsel had adequately explained the plea deal offered by the State: "[T]he State would dismiss the two felony charges if [Aleh] would enter a guilty plea to the three counts of class B misdemeanors." In other words, the dismissal of the felony charges against Aleh hinged on his pleading guilty to the misdemeanor charges. Thus, because Aleh rejected the State's plea deal, the court found that Aleh's "claim that the two felony counts were in fact dismissed and the case was bound over on the misdemeanors is not an accurate reflection of what occurred."

¶5 We denied Aleh's petition seeking interlocutory review, and the supreme court denied his petition for writ of certiorari. Aleh proceeded to trial on all charges.

*Trial*

¶6 At trial, Aleh's neighbor testified that on the night in question Aleh gave him a ride to meet a girlfriend at a motel. At the motel, after getting a key to the room and discovering the girlfriend was not there, Aleh and his neighbor "decided to hang out . . . in the motel." Aleh then called an escort and arranged for her to meet him at the motel in exchange for cash.

¶7 When the escort arrived, Aleh and another man were in the motel room. The other man, presumably Aleh's neighbor, left and the escort told Aleh that "it's $150 for the hour." Because

Aleh told her he only had $100, she told him that she "could stay for half the time, or less." After Aleh gave her the money, the escort went into the bathroom to change clothes. When she came out she asked Aleh "what he wanted to do with his time." She testified, "He asked for sex. I told him that that's not what we do. What I can do is a body rub or a striptease." Aleh then asked for his money back, and the escort told him, "I don't do refunds."

¶8 Aleh looked angry and became very insistent that the escort give him his money back. The escort, out of a sense of caution and for "self-defense," backed away and then retreated into the bathroom to get dressed. While in the bathroom, she called her bouncer to "tell him there was a situation." Aleh then "busted through the bathroom door." The escort, trying to create distance between herself and Aleh, got into the bathtub. Aleh took her cell phone. She crouched down into the tub and huddled over her purse to try to get her handgun out. She retrieved the gun and chambered a round, but Aleh came down on top of her. During the struggle, the gun discharged in the bathtub. The escort then succeeded in ejecting the magazine from the gun; she let go of the gun, Aleh stepped away, and she regained her footing. At this point, the escort returned the $100 and asked Aleh to return her phone. Aleh refused and tried to trap the escort in the bathroom. The escort braced her feet against the bathroom door so that Aleh could not lock her in.

¶9 When Aleh moved away from the door, the escort came out of the bathroom and saw Aleh standing between her and the front door holding her phone, her gun, and the magazine. The escort again asked Aleh to give her phone back; when Aleh refused, she grabbed it out of his hands. Another fight ensued. Aleh threw her into a shoe rack, and she tried to find protection by hiding under a chair. Aleh tried to move the chair, but then "stopped [and] he just stood there for a minute and then he ran out the front door." The escort crawled to the front door to call for her bouncer, and then she saw the police.

¶10    At trial, Aleh gave a different version of events. Aleh testified that he gave the escort $100 to "hang out, like to have fun, you know, like she can dance for me, just strip. Like . . . when you go to [the] strip club." He then testified that when the escort came out of the bathroom in her underwear she tried to sell him the "full service." When Aleh came to understand that "full service" included sex, he told her, "I don't want to do this," and asked for his money back. He testified that he walked with her to the bathroom, and he realized "she was struggling with something inside her purse." Aleh testified that he thought she might have a Taser in her purse and that she would tase him and steal his wallet. So, he testified, when he saw something metal emerge from her purse, he just grabbed it, not even realizing it was a gun until it went off. After Aleh took the gun away, he gave the escort her phone back and left the motel room.

¶11    Aleh was charged with robbery and theft, second degree felonies, and assault, unlawful detention, and sexual solicitation, class B misdemeanors. A jury convicted him as charged. Aleh appeals.

ISSUES ON APPEAL

¶12    Aleh raises two issues on appeal. First, Aleh contends that the trial court erred in denying his motion to withdraw his waiver of the preliminary hearing. Second, Aleh contends that the trial court erred by not allowing him to cross-examine the escort about whether she worked as a prostitute and why she stopped working as an escort after the incident.

ANALYSIS

I. Preliminary Hearing

¶13    Aleh contends that the trial court erred in denying his motion to withdraw the waiver of his right to a preliminary

hearing. Aleh argues that he did not knowingly, intelligently, or voluntarily waive his right to a preliminary hearing, and thus the trial court's refusal to reinstate his right to a preliminary hearing violated his constitutional rights. We review the trial court's denial of Aleh's motion to withdraw his waiver for correctness. *See State v. Hernandez*, 2011 UT 70, ¶ 3, 268 P.3d 822.

¶14    "The fundamental purpose served by the preliminary examination is the ferreting out of groundless and improvident prosecutions." *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980), *superseded on other grounds by constitutional amendment*, Utah Const. art. I, § 12 (1995). Doing so "relieves the accused from the substantial degradation and expense incident to a modern criminal trial when the charges against him are unwarranted or the evidence insufficient." *Id*. at 784. Historically, our courts viewed the preliminary hearing as serving secondarily as "a discovery device in which the defendant is not only informed of the nature of the State's case . . . but is provided a means by which he can discover and preserve favorable evidence." *Id*. However, a constitutional amendment eliminated this secondary purpose in 1995. That constitutional amendment declared that the function of the preliminary hearing "is limited to determining whether probable cause exists unless otherwise provided by statute." Utah Const. art. I, § 12. No statute provides otherwise. *See* Utah Code Ann. § 78A-2-220(1)(f) (LexisNexis 2012) (providing that a magistrate has the authority to conduct a preliminary examination "to determine probable cause"); *see also State v. Timmerman*, 2009 UT 58, ¶¶ 14–15, 218 P.3d 590; *State v. Arghittu*, 2015 UT App 22, ¶ 30, 343 P.3d 709. Accordingly, the preliminary hearing's erstwhile primary purpose has become its sole purpose: determining whether probable cause exists.

¶15    At a preliminary hearing, "the prosecution has the burden of producing believable evidence of all the elements of the crime charged, but this evidence does not need to be capable of supporting a finding of guilt beyond a reasonable doubt." *State v. Virgin*, 2006 UT 29, ¶ 20, 137 P.3d 787 (citation and internal

quotation marks omitted). The determination of guilt beyond a reasonable doubt rests with the fact-finder at trial. *See id.* ¶ 21. "Therefore, 'an error at the preliminary stage is cured if the defendant is later convicted beyond a reasonable doubt.'" *Thomas v. State,* 2002 UT 128, ¶ 7, 63 P.3d 672 (quoting *State v. Quas,* 837 P.2d 565, 566 (Utah Ct. App. 1992)); *accord State v. Rhinehart,* 2007 UT 61, ¶ 20, 167 P.3d 1046 (stating that "a subsequent conviction beyond a reasonable doubt cures any bindover defect" (citing *State v. Winfield,* 2006 UT 4, ¶ 26, 128 P.3d 1171)).

¶16    This is so even when the error consists of a complete deprivation of a preliminary hearing. *See Hernandez*, 2011 UT 70, ¶ 29 n.3. In *Hernandez*, the Utah Supreme Court considered whether the Utah Constitution entitled a defendant charged with a class A misdemeanor to a preliminary hearing. *Id.* ¶ 1. The court held that it did. *Id.* Recognizing the sweep of its decision—since many persons convicted of class A misdemeanors had undoubtedly not received preliminary hearings—the court explained that its decision applied only prospectively to "those cases in which there has been no guilty plea or finding of guilt as of the date of this decision." *Id.* ¶ 29 n.3. The holding in *Hernandez* accordingly did not apply to defendants charged with and convicted of class A misdemeanors—despite the complete deprivation of their right to a preliminary hearing. This result was sound "[b]ecause the failure to hold a preliminary hearing is mooted by the entry of a guilty plea or finding of guilt at trial." *Id.*

¶17    This rule makes sense. A guilty verdict "means not only that there was probable cause to believe that the defendant[] [was] guilty as charged, but also that [he is] in fact guilty as charged beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986). Thus, a subsequent conviction renders any error in the preliminary proceeding harmless beyond a reasonable doubt. *See id.* Accordingly, not only would conducting a post-conviction preliminary hearing serve no

purpose, it would compound the "degradation and expense" that the preliminary hearing serves to protect against. *See Anderson*, 612 P.2d at 784.

¶18    Because conviction beyond a reasonable doubt cures any flaw in a preliminary hearing—including the complete deprivation of a preliminary hearing—it necessarily cures any error the trial court may have made in accepting a defendant's waiver of the right to a preliminary hearing. Accordingly, Aleh's conviction of all charges beyond a reasonable doubt cured any possible error attending his waiver of a preliminary hearing.[2]

## II. Impeachment

¶19    Aleh next contends that the trial court erred by limiting his cross-examination of the escort's testimony under rules 412 and 608 of the Utah Rules of Evidence. "Even if the [trial] court

---

2. In a rule 24(j) letter filed after oral argument in this case, Aleh brought to our attention *State v. Jensen*, 136 P.2d 949 (Utah 1943). In *Jensen*, our supreme court asked, "Was defendant given a preliminary hearing for the offense of which she was convicted? If she was not the cause must be reversed, regardless of the other claimed errors in the trial." *Id.* at 951. The court continued, "That defendant cannot lawfully be tried and convicted on a charge upon which she was not given, or on which she did not waive a preliminary hearing is elemental."*Id.* at 951–52. To the extent that *Jensen* stands for the proposition that a conviction does not cure any error in the preliminary hearing, including the complete deprivation of a preliminary hearing, we conclude that the more recent precedent on which we rely implicitly overruled *Jensen* on this point. *See State v. Hernandez*, 2011 UT 70, ¶ 29 n.3, 268 P.3d 822; *State v. Rhinehart*, 2007 UT 61, ¶ 20, 167 P.3d 1046; *State v. Winfield*, 2006 UT 4, ¶ 26, 128 P.3d 1171; *Thomas v. State*, 2002 UT 128, ¶ 7, 63 P.3d 672; *see also United States v. Mechanik*, 475 U.S. 66, 70 (1986).

did err, we will not reverse if that error was harmless." *State v. Perea*, 2013 UT 68, ¶ 97, 322 P.3d 624. "Harmless errors are errors which, although properly preserved below and presented on appeal, are sufficiently inconsequential that we conclude there is no likelihood that the error affected the outcome of the proceedings." *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) (citation and internal quotation marks omitted). Accordingly, we will not reverse the trial court's determination unless, absent the error, "the likelihood of a different outcome [is] sufficiently high to undermine confidence in the verdict." *Id.* (citation and internal quotation marks omitted). Assuming without deciding that the trial court committed evidentiary error, and that Aleh preserved an appellate challenge to that error, we conclude that any error was harmless.

¶20    In his opening statement, Aleh's counsel referred to the escort as a "prostitute" fourteen times. Yet the escort consistently denied ever working as a prostitute. When she took the stand as a witness for the State, she testified that on the night in question she was working as an escort. She described escorting as "adult entertainment" where the escort might "[d]o public dates, body massaging, stripping, [and] bachelor parties." She also testified that her company held meetings with police officers and attorneys who apprise escorts "of all of the laws and what [they] can and can't do," and that during her employment as an escort she obeyed those laws.

¶21    The escort also testified that she quit working as an escort "[a] few months after" the incident in question. Aleh's counsel pressed her on this point, stating, "Okay, so since this time— since this incident, July 18, 2010, you took no more escort work?" She replied, "No, I did for a few months and then I quit." She explained that she quit a few months later because "[a]fter this, every time I went on a call my heart would race and I would get nervous, and I was too scared. It just made it too hard." Aleh's counsel peppered her with questions about whether, as an escort, she operated within the bounds of the law:

Q. [A]nd it's your testimony that you were aware of the law regulating the escort profession?

A. Yes.

Q. You kept your activity within the limits of the law, correct?

A. Yes.

Q. That's something you strove to do, correct?

A. Yes.

Q. You limited your activity to stripteases?

A. Yes.

Q. Escorting men to parties and functions?

A. Yes.

Q. And massages, correct?

A. Yes. At the time, massages were legal.

. . . .

Q. Still legal, correct?

A. No.

. . . .

Q. So you kept it legal, is what you're saying?

A. Yes.

Then Aleh's counsel, in response to the escort's adamant testimony that she worked within the bounds of the law asked, "You learned [to keep it legal] the hard way; isn't that right? You've had your run-ins with the law in connection with being an escort?" The State objected on the basis that the question

violated rule 412 of the Utah Rules of Evidence.[3] After a discussion at the bench and off the record, the trial court sustained the State's objection.

¶22 On appeal, Aleh contends that the trial court erred in not allowing him to question the escort on cross-examination about her past "run-ins" with law enforcement. Specifically, Aleh argues that rule 608(b) of the Utah Rules of Evidence permitted him to attack the escort's credibility on cross-examination.[4] The State contends that the trial court did not abuse its discretion in prohibiting Aleh's inquiry into the escort's prior encounters with law enforcement and that even if the trial court erred, any error was harmless. We agree with the State on the latter point, which disposes of this claim.

---

3. Rule 412 states in relevant part:

> The following evidence is not admissible in a criminal proceeding involving alleged sexual misconduct: (1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition.

Utah R. Evid. 412(a).

4. Rule 608(b) states in relevant part:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, *on cross-examination*, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . .

Utah R. Evid. 608(b)(1) (emphasis added).

¶23    Aleh argues that the exclusion of the testimony his questions would have elicited was "reversible error." He asserts that the evidence in this case largely boiled down to "a matter of 'he said, she said,'" and thus "credibility was a critical factor in determining whether [the escort's] allegations were true beyond a reasonable doubt." Specifically, Aleh posits that "there is a reasonable likelihood that [the escort's] credibility as the main prosecution witness would have been tainted had the jury heard about her encounters with law enforcement, as well as the fact that she was still working as an escort just four weeks later." Aleh concludes that had the trial court allowed him to pursue the proposed line of inquiry it "could have tipped the scale in [his] favor."

¶24    Under the rules of evidence, a party may claim error in a ruling excluding evidence only if, among other things, that "party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Utah R. Evid. 103(a). This rule serves an appellate purpose, as "it is essentially impossible to demonstrate prejudice in the absence of a proffer of what the excluded evidence would show." *Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242.

¶25    But the record before us contains something even better than a proffer. During a recess and outside the presence of the jury, the trial court, to its credit, allowed Aleh to make a record of the escort's answers to counsel's impeachment questions. Thus, we have the benefit of knowing the answers to the questions the trial court did not allow. The escort's answers revealed that on two occasions apparent clients turned out to be undercover police officers. But in neither case was she convicted, charged, or even arrested for prostitution:

Q. Now, it was your testimony that you don't have sex with your clients, correct?

A. Yes.

Q. It was your testimony that you kept your conduct within the parameters of the law, correct?

A. Yes.

Q. So all you offered was stripteases and massages?

A. Yes.

Q. You call them "erotic massages," but that's just because you're wearing lingerie?

A. Yes.

Q. Okay, but you have had run-ins with the law in connection with being an escort, correct?

A. Yes.

Q. Okay, in fact four weeks, just about four weeks after this incident . . . you went to [a hotel] in West Valley City, correct?

A. No.

Q. You didn't?

A. It was [a different hotel].

Q. Okay . . . are you sure about that?

A. Yes.

. . . .

Q. You were going to visit a client, correct?

A. Yes.

. . . .

Q. [W]hat were you going to do?

A. It was a small party.

Q. Okay, in your purse you had handcuffs, right?

A. Yes.

Q. You had lubricant?

A. Yes.

Q. Okay, a [T]aser?

A. Yes.

. . . .

Q. Okay, the client turned out to be an undercover West Valley Police Officer, isn't that correct?

A. Yes.

Q. Okay, and also before 2010, around 2005, was that when you went to [another hotel]?

A. Yes.

. . . .

Q. You went there to meet a client?

A. Yes.

. . . .

Q. And the client turned out to be an undercover police officer?

A. Yes.

Again, in this cross-examination, the escort denies that she engaged in prostitution, and her police encounters, if anything, confirm that denial because no arrest resulted, much less a conviction. Accordingly, as Aleh himself acknowledges in his brief, this testimony "would not necessarily have impeached [the escort]."

¶26   We agree. The excluded testimony has little if any impeachment value. It merely establishes that the escort worked within the bounds of the law, a fact to which she had already testified. True, the handcuffs and lubricant might imply a meretricious motive. But these items did not even create probable cause to justify an arrest by the undercover officer. Indeed, the take-away from the escort's encounters with police was that she had *not* been engaging in prostitution. Thus, if anything, the excluded testimony would have corroborated the escort's version of events at trial.

¶27   Aleh also sees "a reasonable likelihood that [the escort's] credibility as the main prosecution witness would have been tainted had the jury heard . . . that she was still working as an escort just four weeks later." The escort testified that she quit working as an escort "[a] few months after" the incident with Aleh because she "was too scared." Aleh argues that had the trial court allowed him to question the escort about her encounters with law enforcement, "[t]here is a reasonable likelihood the jury would have believed that it was her encounter with the police that caused her to quit working as an escort," and not her almost getting shot during the scuffle with Aleh.

¶28   We conclude that questioning the escort about her encounters with law enforcement would not have materially impeached her testimony. The first police encounter with which Aleh wanted to confront the escort occurred in 2005. But no juror was likely to see this encounter as the cause of her abandoning her career five years later. The second police encounter with

which Aleh wanted to confront the escort occurred approximately one month after the incident with Aleh. This encounter presents a somewhat closer question. But it was undisputed at trial that the escort had engaged in a struggle with a client (Aleh) that resulted in a gun being discharged in the narrow confines of a bathroom. Reasonable jurors could conclude that such an ordeal would cause any but the most desperate or deluded escort to reconsider her occupation— whoever initiated the scuffle. Compared to this brush with death, an encounter with a police officer that resulted in no conviction, no charge, and no arrest would appear, in the mind of any reasonable juror, relatively innocuous. We are thus not persuaded that preventing Aleh's counsel from delving into the police encounters would have any effect—much less an outcome-determinative effect—on the jury's assessment of the case. We therefore conclude that any possible error by the trial court was "sufficiently inconsequential that we [see] . . . no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) (citation and internal quotation marks omitted). Accordingly, we affirm the judgment of the trial court. *See id.*

CONCLUSION

¶29    In sum, Aleh's convictions cured any error related to his waiving a preliminary hearing. In addition, any error in limiting his cross-examination of the escort was harmless. The judgment of the trial court is accordingly affirmed.

_____