**2024 UT App 141**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES A. WILLIAMSON,
Appellant.

Opinion
No. 20220664-CA
Filed October 3, 2024

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
No. 211401401

Jennifer L. Foresta, Douglas J. Thompson, and
Benjamin R. Aldana, Attorneys for Appellant

Sean D. Reyes, Daniel W. Boyer, Natalie M.
Edmundson, and Connor Nelson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1     James A. Williamson appeals from his convictions on three counts of sexual exploitation of a minor. He contends that a police search of his residence violated his constitutional right against unreasonable searches and seizures because the search warrant affidavit was based on the fruits of an unconstitutional pre-warrant search of his private computer files and because a material fact was recklessly omitted from the affidavit. Williamson also contends that his constitutional rights to notice and a preliminary hearing were violated because the items of child pornography used to convict him at trial were different from the items of purported child pornography used to bind him over

for trial. We see no error in the district court's determinations that his constitutional rights to be free from unreasonable searches and seizures and to notice were not violated, and we conclude that any violation of his right to a preliminary hearing was cured when he was convicted beyond a reasonable doubt. We therefore affirm.

BACKGROUND

*Tips Regarding Child Pornography*

¶2　The National Center for Missing & Exploited Children (NCMEC) is a nonprofit organization that, among other things, operates a "CyberTipline" to "provide to individuals and electronic service providers an effective means of reporting internet-related and other instances of child sexual exploitation." *About Us*, Nat'l Ctr. for Missing & Exploited Child., https://www.missingkids.org/footer/about (expand "About NCMEC's Programs and Services" section) [https://perma.cc/427H-DB6C]. In June 2021, the Orem City Police Department received from NCMEC multiple CyberTipline reports identifying dozens of files categorized as "Apparent Child Pornography" that were saved in Google accounts associated with Williamson. A detective (Detective) in the police department's special victims unit was assigned to investigate one of those reports.

¶3　The CyberTipline report at issue identified thirty-four files. Copies of those files were sent by Google to NCMEC, and NCMEC placed those copies "into [a] database that law enforcement has access to and can go view." Using the database, Detective opened four of the files—two pictures and two videos—to verify their content. Each of the files contained pornographic material; two showed images of actual persons who appeared to Detective to be minors, and the other two showed computer-generated "animated individuals" who appeared to Detective to also be minors.

¶4    Detective then called and talked with Williamson. Detective described the files that he had found on the Google account and asked Williamson "to explain the situation." Williamson admitted that the account was his, but he said he had not accessed it for about a year "due to him believing that it had been hacked."

¶5    Detective was also able to trace the IP address identified in the CyberTipline report and determine, through information from the internet service provider and from a records check, that Williamson's residence was at the physical address associated with the IP address at the relevant time.

*The Search Warrant*

¶6    Detective prepared a search warrant affidavit, in which he related these initial investigatory steps and findings as grounds for the issuance of a search warrant. In the affidavit, Detective specifically described just one of the files at issue, saying that it showed a "[c]omputer-generated image that depicts a pre-pubescent girl, completely naked," with "a male that is having vaginal intercourse with her." The affidavit then related that "[s]everal other videos and images were located that contained similar material with children involved in sexual acts." An attorney from the Utah County Attorney's Office reviewed and approved Detective's affidavit "for presentation to the court."

¶7    A search warrant was issued, and while executing the warrant on Williamson's residence, officers discovered in his bedroom an open laptop computer that was logged in to an apparent "pornographic website" under the same username as the one identified in the CyberTipline report. The officers on scene also found and seized thirty-four USB flash drives from Williamson's bedroom.

¶8    Detective later looked at the content of the flash drives and found that "each one of [them] had at least one file that appeared to be child pornography." Detective did a "deeper dive" into one

of the flash drives, reviewing over one thousand files. One of the files was a picture of Williamson, but "[o]ther than this one image, it appeared that the vast majority, if not all the other images, were pornographic videos," some of which appeared to depict minors.

## *The Information*

¶9      Based on the foregoing evidence, Williamson was charged with three counts of sexual exploitation of a minor. The information described each of the three counts as follows:

> SEXUAL EXPLOITATION OF A MINOR, Second Degree Felony, in violation of Utah Code Ann 76-5b-201, in that on or about 8/5/2021, in Utah County, the defendant, James A. Williamson did, (a) knowingly produce, possess, possess with intent to distribute, distribute, or view child pornography; or (b) as a minor's parent or legal guardian, knowingly consent to or permit the minor to be sexually exploited as described in Utah Code Ann. § 76-5b-201(1)(a).

## *The Preliminary Hearing*

¶10      At the preliminary hearing, Detective testified regarding his investigation, including by relaying the facts surrounding the CyberTipline report, the results of the search conducted at Williamson's residence, and what he had found on the recovered flash drives. Detective described in some detail the contents of three specific files found on the one flash drive he had investigated more thoroughly, testifying that they depicted sexual activity involving pubescent and pre-pubescent minors. Based on Detective's testimony, the district court bound Williamson over for trial on each of the three counts.

*The Motion to Suppress*

¶11    Williamson then filed a Motion to Suppress Evidence and Request for *Franks* Hearing. *See generally Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) (mandating, under certain circumstances, an evidentiary hearing when a defendant makes "allegations of deliberate falsehood or of reckless disregard for the truth" by an affiant seeking a search warrant). He requested on two grounds the suppression of all evidence seized during the execution of the search warrant. First, he argued that the search warrant was obtained in violation of his constitutional right to be free from unreasonable searches and seizures, under both the Utah and the United States constitutions, because the warrant was based on a description of a file copied from Williamson's Google account that Detective opened and viewed without a warrant when neither Google nor NCMEC had viewed its contents concurrently to when they provided the files to police. Second, Williamson argued that because the image described in Detective's affidavit did "not depict[] an actual child" but was, instead, "a cartoon" or "anime," the affidavit "omitted material information" and "misled the reviewing magistrate into concluding that probable cause existed for issuance of the search warrant." On this latter ground, Williamson also requested a *Franks* hearing.

¶12    At oral argument on the motion, the district court viewed the image at issue and agreed that "[D]etective's description of [the file] in his affidavit as a computer generated image [was] misleading" because it suggested that the image was a digitally modified image of an actual child as opposed to an image that was "completely created with digital means." The court therefore granted Williamson's request for a *Franks* hearing.

¶13    At the *Franks* hearing, Detective testified regarding hash values and the part they played in the creation of the CyberTipline report that prompted his investigation. He noted that a "hash value is a value that is assigned to any kind of digital file, typically images or videos." He then explained that a hash value functions "like a digital fingerprint" because it is thirty-two digits long and

there are thirty-six possible characters for each digit, resulting in a myriad of potential combinations: "So the number of available . . . combinations . . . [has] got 50 zeroes behind it, approximately." He testified that if two image files share the same hash value, it is "an absolute certainty" that the files contain the same image. Detective further explained that NCMEC has gathered "a large database of hash values" of "images and videos that have been previously viewed" by NCMEC or an internet service provider and been found to contain apparent child pornography. Thus, Detective explained, electronic service providers are able to use hash values as a sort of "filter" to scan user accounts, detect "what they believe to be child pornography," and report those files to NCMEC.

¶14    Turning to the single file he had specifically described in his affidavit, Detective read from the CyberTipline report, which explained that although the report answered "no" to the question of whether the file had been reviewed by Google, other language on the report clarified that while the contents of the file had not been "viewed *concurrently*" with the making of the CyberTipline report, "historically a person *had* reviewed a file whose hash or digital fingerprint matched the hash of the reported image and determined it contained apparent child pornography." (Emphasis added.) Detective also explained that he had selected this one file because it "was the easiest one to describe" and because it "depicted a prepubescent girl and it showed her not only nude but engaged in sexual activity." Detective also explained that a deputy attorney at the Utah County Attorney's Office had reviewed the affidavit, had a question about "whether the image [Detective] had listed would fit in the definition [of child pornography] per some arguments about animated versus real life" images, had "confer[red] with a colleague," and, after conferring, "didn't have any further issues with" the affidavit as written.

¶15    The district court ultimately denied Williamson's motion to suppress. The court explained that although it agreed that "there was a material omission" in Detective's affidavit because it

failed to clarify that the file described in the affidavit contained "an animated image" as opposed to an image of an actual child that had been modified by a computer, the court did *not* agree that this omission was recklessly made. The court determined that because Detective had sought legal guidance, even though "he got some bad information," "it was not reckless for him to rely on the legal guidance that he received." The court also reasoned that Detective had not had any reason to be misleading because he had viewed other images from the CyberTipline report that "were of actual children" and had he instead described one of *those* images in his affidavit, there was "no doubt the warrant would have been approved." As to Detective's viewing of files identified in the CyberTipline report before obtaining a warrant, the court determined that this case presented "a clean application of the private search doctrine" because the files Detective opened had "already [been] looked at" by Google and NCMEC since "[t]he hash value indicates what that image is."

*Other Pretrial Filings*

¶16    In February 2022, the State submitted a Notice of Trial Witnesses and Exhibit List. That document listed as items the State might seek to admit at trial the "[i]mages and videos found on electronic devices during [the] search of [Williamson's] room." In March 2022, Williamson waived his right to a jury trial, and a bench trial was set for April 11, 2022. Also in March 2022, the prosecutor and Detective met with Williamson's counsel and a defense expert. Together they viewed nineteen images and videos that the State was considering presenting as exhibits at trial. Absent from those nineteen images and videos was one of the three videos Detective had described at the preliminary hearing.

¶17    On April 5, 2022, Williamson filed a Trial Brief of Defendant. Therein, he argued that at trial the State should be allowed to rely on only the three specific files Detective had described at the preliminary hearing to support the three charges against him. Williamson also argued that those three files would not support the charges against him because two of them "most

likely depict adults rather than minors" and the third should not be admitted at trial because the defense—with trial just days away—had not yet been permitted to view the file.

¶18 The State responded by arguing that granting the limitation requested by Williamson "would be absurd and would for all intents and purposes turn a preliminary hearing into a trial." The State argued that it had "narrowed the potential range of pornographic images it would present at trial to nineteen files which were [shown] to defense counsel and his expert twenty-six days before trial" and, therefore, that "[u]sing different files than the three described at the preliminary hearing [would] not prejudice the 'substantial rights of the defendant.'"

*The Bench Trial*

¶19 At the beginning of the bench trial, the district court and counsel discussed the issues raised in Williamson's trial brief. The prosecutor indicated that the State had decided to present just nine files, all of which had been recovered from Williamson's one USB flash drive that Detective had investigated more thoroughly. Defense counsel renewed the argument from Williamson's trial brief but also conceded that the defense's expert had concluded that six of the nine files the State intended to present did contain child pornography. The court took the issues raised in Williamson's trial brief under advisement and proceeded to the presentation of evidence.

¶20 The State ultimately presented in its case against Williamson only the nine files it had identified during the discussion at the outset of the trial. Only one of those nine was among the three that had been described at the preliminary hearing. As to that file, the defense's expert—who had been called by the State as part of its case in chief—testified, with reference to the female shown in the video, "I believe this to be a female over the age of 18." The expert acknowledged, however, that it was "possible" that the female shown was a minor.

¶21   After the State rested, Williamson moved for a directed verdict, arguing that because two of the files described at the preliminary hearing had not been presented at trial and because the third could not be proved beyond a reasonable doubt to be a depiction of child pornography, a not-guilty verdict was required. The district court denied the motion, explaining that it saw nothing in Utah's procedural rules or case law that supported limiting the State to just the files described at the preliminary hearing when presenting its case at trial. Instead, the court stated, "The State is not bound . . . to simply present the exhibits that it presented at the preliminary hearing. It can expand upon those to present its comprehensive or best case at trial . . . ."

¶22   At the conclusion of trial, the district court found Williamson guilty on all three counts of sexual exploitation of a minor. It reasoned that there were six files that both parties agreed were child pornography and that the State had met its burden to show that Williamson intended to possess and view those files.

*The Posttrial Filings*

¶23   Williamson thereafter moved to arrest judgment, arguing again that the State should have been limited to supporting its case with only the three files described at the preliminary hearing. The district court heard oral argument on the motion and then once more rejected this argument. The court reasoned that "there should be some identification [of files] if requested" but that "it was up to [the] defense to request a bill of particulars to nail that down" and the defense had made no such request. The court therefore denied the motion to arrest judgment.

¶24   The district court sentenced Williamson to three concurrent prison terms of one to fifteen years. Williamson timely appealed his conviction and sentence.

ISSUES AND STANDARDS OF REVIEW

¶25    Williamson challenges the district court's denial of his motion to suppress. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact. While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937.

¶26    Williamson also argues that his constitutional rights to notice and a preliminary hearing were violated when the district court allowed the State to support the charges against him with files other than those introduced at the preliminary hearing. "Whether a defendant's constitutional rights were violated is a question of law, which we review for correctness." *State v. Sheehan*, 2012 UT App 62, ¶ 16, 273 P.3d 417 (cleaned up).

ANALYSIS

I. The Motion to Suppress

¶27    Williamson argues that the district court erred by denying his motion to suppress. He maintains that the police search violated his Fourth Amendment right "against unreasonable searches and seizures," *see* U.S. Const. amend. IV,[1] because the

---

1. Williamson also cites the largely identical provision from the Utah Constitution, *see* Utah Const. art. I, § 14, but he does not suggest that the analysis under that provision should be different from the analysis under its federal counterpart. Further, because the state constitutional provision "reads nearly verbatim with the fourth amendment," our supreme court "has never drawn any distinctions between the protections afforded by the respective constitutional provisions" but has, instead, "always considered the protections afforded to be one and the same." *State v. Watts*,

(continued…)

affidavit underlying the search warrant was (A) "based on the fruits of an unconstitutional warrantless search of [his] private files" and (B) "invalidated by the reckless omission of material facts." We address each argument in turn.

### A.    The Warrantless Search

¶28    "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (cleaned up). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* at 382. One such exception is the private search exception.

¶29    "It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984); *see also United States v. Miller*, 425 U.S. 435, 443 (1976) (explaining that the Fourth Amendment allows prosecutors to use "information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed"). However, "[t]he Fourth Amendment is implicated . . . if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Jacobsen*, 466 U.S. at 117. "In such a case the authorities have not relied on what is in effect a private

---

750 P.2d 1219, 1221 (Utah 1988). We therefore do not separately address a state constitutional argument in our analysis. *See Salt Lake City v. Wood*, 1999 UT App 323, ¶ 6, 991 P.2d 595 (declining to address the appellant's state constitutional arguments where the appellant "fail[ed] . . . to demonstrate that any additional or different protection is afforded under the Utah Constitution"), *cert. denied*, 4 P.3d 1289 (Utah 2000).

search, and therefore presumptively violate the Fourth Amendment if they act without a warrant." *Id.* at 117–18.

¶30　This is precisely what Williamson argues happened here— that when, prior to obtaining a warrant, Detective opened copies of four of Williamson's files that had not been opened by Google concurrently to when it passed them on to NCMEC and had not been opened by NCMEC concurrently to when it made them available to law enforcement, Detective "exceeded the scope of any private search." On this basis, Williamson contends that the private search exception does not apply to Detective's warrantless search of his files.

¶31　In support of this argument, Williamson points to the United States Supreme Court's decision in *Walter v. United States*, 447 U.S. 649 (1980) (plurality opinion). *Walter* involved the mistaken delivery of packages containing hundreds of boxes of 8-millimeter film. *Id.* at 651. The recipient company opened the packages and observed that the labels on the individual boxes of film provided "explicit descriptions of the contents." *Id.* at 651–52. Suspecting contraband due to the descriptions on the boxes, the company contacted the FBI and turned over the film. *Id.* at 652. FBI agents then viewed the films with a projector, discovered that they were indeed contraband, and filed charges based on several of the films. *Id.*

¶32　The *Walter* Court concluded that the FBI agents' viewing of the films with a projector did not fit within the private search exception and amounted to an unconstitutional "additional search conducted by the FBI." *Id.* at 659. The Court reasoned that although "the nature of the contents of these films was indicated by descriptive material on their individual containers," *id.* at 654, those descriptions only allowed the agents to "draw inferences about what was on the films," *id.* at 657. Thus, the Court reasoned, "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search." *Id.*

¶33    Williamson attempts to draw a parallel between the film labels in *Walter* and the hash values at issue in this case, arguing that "a hash value may indicate the contents of a file, but prior to the government actually viewing the file, it can only infer the contents from the label or hash value." We disagree and instead concur with the State that the search here was more akin to the one described in *United States v. Jacobsen*, 466 U.S. 109 (1984).

¶34    *Jacobsen* involved a package that had been damaged in transit. *Id.* at 111. Employees of the common carrier transporting the package opened it and discovered inside "a tube about 10 inches long." *Id.* They slit open the tube and "found a series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing about six and a half ounces of white powder." *Id.* The employees contacted the Drug Enforcement Administration (DEA), placed the bags back inside the tube, and returned the tube to the box. *Id.* When a DEA agent arrived, he saw the tube in the box and that it had been slit open and then proceeded to remove the four plastic bags from the tube. *Id.* He also saw the white powder and removed some of it for a field test, which revealed that the powder was cocaine. *Id.* at 111–12.

¶35    The *Jacobsen* Court determined that, under these circumstances, the private search exception applied. *Id.* at 120. The Court recognized, citing *Walter*, the established rule that "[t]he additional invasions of [a person's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115. And because "the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search," this action "infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment." *Id.* at 120.

¶36    Given the established nature of hash values and the meaning they convey, we conclude that this case is controlled by *Jacobsen*. Detective's action in opening four of the files that had

been made available to law enforcement by NCMEC did not allow Detective to see or discover anything "that had not previously been learned during [a] private search." *Id.* Even though the files' contents may not have been viewed by either Google or NCMEC concurrently to their submission to law enforcement, the contents of files with hash values identical to those submitted to law enforcement had been viewed and flagged previously, and Google therefore knew exactly what was contained within each of the files.

¶37 We simply do not agree with Williamson's assertion that a hash value match allows the government to "only infer the contents" of the file. Detective testified that a hash value is "like a digital fingerprint" and that a hash value match results in "an absolute certainty" that the two files have the same content.[2] In this case, Detective's viewing of any of the reported files would not have exceeded the scope of the preceding private search

---

2. This testimony is consistent with the explanation accompanying an amendment to the Federal Rules of Evidence that allows self-authentication of documents via the use of matching hash values:

> Today, data copied from electronic devices, storage media, and electronic files are ordinarily authenticated by "hash value". A hash value is a number that is often represented as a sequence of characters and is produced by an algorithm based upon the digital contents of a drive, medium, or file. If the hash values for the original and copy are different, then the copy is not identical to the original. If the hash values for the original and copy are the same, it is highly improbable that the original and copy are not identical. Thus, identical hash values for the original and copy reliably attest to the fact that they are exact duplicates.

Fed. R. Evid. 902 advisory committee's note to 2017 amendments.

because it did not have the potential to uncover any information that had not previously been discovered by the private entities.

¶38    We also do not agree with Williamson's argument, which is based on the fact that some files identified in the CyberTipline report ended up not containing child pornography, that because a "hash match does not give a 'virtual certainty' that [a flagged] item is contraband," the private search exception cannot apply here. (Quoting *Jacobsen*, 466 U.S. at 119.) Williamson misapplies the language he quotes from *Jacobsen*, which does not limit the private search exception to instances where there is a virtual certainty that the private search revealed contraband. *See Jacobsen*, 466 U.S. at 119. Instead, the *Jacobsen* Court, in concluding that the DEA agent's actions in that case did not exceed the private search exception, observed that "there was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told." *Id.* Likewise here, there was a virtual certainty that nothing else of significance was in the files identified in the CyberTipline report and that Detective's inspection of them would not tell him anything more than he already had been told—i.e., that they contained apparent (though perhaps not certain) child pornography.

¶39    In sum, Detective's pre-warrant viewing of the contents of files identified in the CyberTipline report did not constitute an impermissible warrantless search, and the district court did not err in denying the motion to suppress based on the argument that it was.

B.    Reckless Omission of Material Facts

¶40    "In considering a challenge to a warrant for lack of probable cause, we normally limit our review to the facts in the supporting affidavit . . . ." *State v. Fuller*, 2014 UT 29, ¶ 24, 332 P.3d 937. However, in *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court "created a narrow exception to this general rule by permitting a defendant to challenge a search

warrant using extrinsic evidence where it is alleged that the affidavit contains false statements or omissions." *Fuller*, 2014 UT 29, ¶ 24. To bring a *Franks* challenge, the defendant must,

> by a detailed offer of proof, (1) make[] a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading and (2) demonstrate[] that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.

*Id.* ¶ 25 (cleaned up). After meeting that burden, the defendant is then entitled to a hearing during which the defendant "must prove by a preponderance of the evidence both that the omission in the affidavit was material and that the critical information was intentionally or recklessly excluded." *Id.* ¶ 26. "To show that the affiant deliberately or recklessly misled the magistrate, the defendant must offer either direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts." *Id.* (cleaned up).

¶41 Here, the district court determined that Williamson was entitled to an evidentiary hearing based on having made a sufficient preliminary showing that Detective recklessly omitted a relevant fact from his affidavit—that the image described in detail was not just "[c]omputer-generated," but "completely created with digital means." But Williamson challenges the court's later factual determination, after that hearing, that although "there was a material omission" in Detective's affidavit, the omission was not recklessly or deliberately made.

¶42 The district court's finding was based partly on the fact that Detective sought legal guidance from the Utah County Attorney's Office. The court found, "[Detective] wanted to check the use of [the 'computer generated'] phrase to make sure it was accurate, and he relied on what he was told." The court's finding was also

based on a determination that Detective had no reason "to have been misleading" because some of the other files he had viewed contained images of children that were not computer-generated, which files would have "no doubt" led to approval of the search warrant. Thus, the court essentially determined that Detective did not have "obvious reasons for omitting facts." *Id.* (cleaned up). And it summed up the situation as follows: "[Detective's conduct] amounts to picking the wrong picture after having relied on advice from Counsel. I don't think that that shows deliberate or reckless misleading on the part of [Detective]." Considering the evidence presented in the evidentiary hearing, we see no clear error in the court's finding that Detective's omission was not recklessly made, and the court therefore did not err in denying the motion to suppress based on this argument.

## II. The Right to Notice and a Preliminary Hearing

¶43 Williamson argues that his Utah constitutional rights to notice and a preliminary hearing were violated when the district court—over his repeated objections—"permit[ted] trial evidence of offenses different from those [for which he was] bound over at the preliminary hearing." We disagree that Williamson's right to notice was violated. And to the extent that his right to a preliminary hearing may have been violated, we conclude that his subsequent conviction beyond a reasonable doubt cured any error.

¶44 "The preliminary hearing is a fundamental procedural right guaranteed by article I, section 13 of the Utah Constitution." *State v. Ramirez*, 2012 UT 59, ¶ 8, 289 P.3d 444. The Utah Constitution also guarantees a defendant the "right to adequate notice of the charged offense." *State v. Wilcox*, 808 P.2d 1028, 1031 (Utah 1991). "The right to adequate notice may be based on the general due process clause in article I, section 7 of the Utah Constitution" or "on the more specific guarantee in article I, section 12." *Id.; see also* Utah Const. art. I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law."); Utah Const. art. I, § 12 ("In criminal prosecutions the accused shall

have the right . . . to demand the nature and cause of the accusation . . . [and] to have a copy thereof . . . ."). "The crux of both theories is that a criminal defendant must be sufficiently apprised of the particulars of the charge to be able to adequately prepare his defense." *State v. Fulton*, 742 P.2d 1208, 1214 (Utah 1987) (cleaned up). The issues in this case do not require us to determine, between the two, which is "the precise source of the right" to notice. *See id.*

¶45 Our supreme court has said that

> the notice to which a defendant is constitutionally entitled may come through one or all of three sources: the charging information, a response to a bill of particulars under rule 4(e) of the Utah Rules of Criminal Procedure, or a response, under section 77-14-1 of the Code, to a demand for the place, date, and time of the offense charged.

*Wilcox*, 808 P.2d at 1031. A requesting defendant "is entitled as a matter of right to both a bill of particulars and a specification of the date, place, and time of the charged crime." *Id.* at 1032. "However, if a defendant fails to request a bill of particulars or make demand for the date, place, and time under section 77-14-1 and a response to either of these would have cured the claimed deficiency, then he or she will be deemed to have waived the constitutional right to adequate notice." *Id.*

¶46 For many years, a request for a bill of particulars and a demand for the place, date, and time of the offense were not the only mechanisms by which a defendant might effectuate the constitutional right to notice because "provid[ing] the defendant with . . . the particulars on the nature of the State's case" was deemed to be one of the "ancillary purposes" of a preliminary hearing as well. *State v. Ortega*, 751 P.2d 1138, 1140 (Utah 1988); *see also State v. Jensen*, 96 P. 1085, 1086 (Utah 1908) (stating that the "purpose" of a preliminary hearing is, in part, "to secure to the accused, before he is brought to trial under an information, the

right to be advised of the nature of the accusation against him"). On the basis that a purpose of a preliminary hearing, when one was requested, was to provide the notice to which a defendant is constitutionally entitled, our supreme court developed a line of cases standing for the proposition that once a defendant receives notice through a preliminary hearing of the "particular transaction" the State "ha[s] in mind," then it is a violation of the defendant's right to a preliminary hearing (and, by logical extension, of the defendant's right to notice) to thereafter convict the defendant based upon a different transaction. *Ortega*, 751 P.2d at 1140 (cleaned up); *see also State v. Jensen*, 136 P.2d 949, 951–52 (Utah 1943); *State v. Nelson*, 176 P. 860, 860–64 (Utah 1918); *State v. Potello*, 132 P. 14, 14–16 (Utah 1913); *State v. Hoben*, 102 P. 1000, 1007 (Utah 1909); *Jensen*, 96 P. at 1086–87.

¶47 Williamson relies on the foregoing principle and supporting line of cases to argue that his rights to notice and a preliminary hearing were violated. Specifically, he observes that he exercised his right to a preliminary hearing and that at that hearing the State put on evidence "of three [specific] offenses (separate items of child pornography) to support the three charges" against him. Williamson then asserts that because he received notice via the preliminary hearing of three specific offenses based on three specific items of child pornography, the State subsequently violated his right to both notice and a preliminary hearing when at trial it proved the charges with evidence of three different offenses (i.e., three items of child pornography other than the ones identified at the preliminary hearing) without first giving Williamson "proper notice [of the alternate offenses] and a new preliminary hearing on the alternate offenses."

¶48 The fatal flaw in Williamson's argument stems from the fact that in 1995 (subsequent to the cases Williamson relies on), article I, section 12 of the Utah Constitution was amended to expressly declare that the function of a preliminary hearing "is limited to determining whether probable cause exists unless otherwise provided by statute." Utah Const. art. I, § 12. Because

no statute provides that an ancillary function of a preliminary hearing is to fulfill the constitutional notice requirement, the 1995 amendment to article I, section 12 effectively overruled that portion of any case that expressly or implicitly held that a request for a preliminary hearing is one way in which a defendant may effectuate the right to notice.[3] *See State v. Aleh*, 2015 UT App 195, ¶ 14, 357 P.3d 12 (observing that "historically, our courts viewed the preliminary hearing as serving secondarily as a discovery device in which the defendant is . . . informed of the nature of the State's case," but concluding that after the 1995 amendment to article I, section 12, "the preliminary hearing's erstwhile primary purpose [of determining whether probable cause exists] has become its sole purpose" (cleaned up)), *cert. denied*, 366 P.3d 1213 (Utah 2016). Thus, the mechanisms by which Williamson was able to effectuate his right to a preliminary hearing were limited to requesting a bill of particulars or making a demand for the date, place, and time of the alleged offense. *See Wilcox*, 808 P.2d at 1032. And when Williamson failed to avail himself of either of these mechanisms, he waived his constitutional right to adequate notice. *See id.*[4]

---

3. Subsequent to the 1995 amendment to article I, section 12 of the Utah Constitution, this court in *State v. Bragg*, 2013 UT App 282, 317 P.3d 452, again described a preliminary hearing as "one opportunity [for the defendant] to explore the exact nature of the charges against him and resolve any confusion about what those charges entail[]." *Id.* ¶ 40. To the extent that this quoted language from *Bragg* suggests that a request for a preliminary hearing remains a viable alternative for effectuating the constitutional right to notice, we disavow that language and any such language found elsewhere in our case law.

4. Williamson asserts that "the focus on the bill of particulars is a red herring," suggesting that a bill of particulars would not have cured the deficiency in the notice he received because he already knew the date, time, and place of the alleged offenses for which

(continued…)

¶49    Moreover, in *State v. Aleh*, 2015 UT App 195, 357 P.3d 12, we recognized that because the sole purpose of a preliminary hearing is to determine whether probable cause exists, "an error at the preliminary [hearing] stage is cured if the defendant is later convicted beyond a reasonable doubt." *Id.* ¶ 15 (quoting *Thomas v. State*, 2002 UT 128, ¶ 7, 63 P.3d 672). We further recognized that "[t]his is so, even when the error consists of a complete deprivation of a preliminary hearing." *Id.* ¶ 16 (citing *State v. Hernandez*, 2011 UT 70, ¶ 29 n.3, 268 P.3d 822). We then considered the proposition articulated in *State v. Jensen*, 136 P.2d 949 (Utah 1943), and the other cases cited in paragraph 46 above—i.e., that if a defendant requests a preliminary hearing and is bound over based on a finding of probable cause as to a particular transaction, it is reversible error to then convict the defendant based on proof of a different transaction. *See Aleh*, 2015 UT App 195, ¶ 18 n.2. And we concluded, "To the extent that *Jensen* stands for the proposition that a conviction does not cure any error in the preliminary hearing, including the complete deprivation of a preliminary hearing, . . . the more recent precedent on which we rely implicitly overruled *Jensen* on this point." *Id.*

¶50    Based on *Aleh*, even if Williamson was denied his right to a preliminary hearing on the specific offenses for which he was

---

he was eventually convicted and a bill of particulars would have provided no additional information. But a bill of particulars is not so limited in the information it may provide. It is available whenever "the facts necessary to inform a defendant of the nature and cause of the offense charged are not otherwise made known or set forth in an information or indictment." *State v. Allen*, 839 P.2d 291, 298 (Utah 1992); *see also* Utah R. Crim. P. 4(e) ("When facts not set out in an information are required to inform a defendant of the nature and cause of the offense charged, so as to enable the defendant to prepare a defense, the defendant may file a written motion for a bill of particulars."). Thus, a bill of particulars would have given Williamson the information required to prepare his defense, and his failure to request one is ultimately fatal to his notice argument.

ultimately convicted, *see generally* Utah Code § 76-5b-201(3)(b) (stating that it is a "separate offense" "for each minor depicted in . . . child sexual abuse material" and "for each time the same minor is depicted in different child sexual abuse material"), that deprivation was cured when—based in part on his own expert's opinion that six of the nine files the State ultimately relied on at trial contained child pornography—he was later convicted beyond a reasonable doubt on three charges of sexual exploitation of a minor. *See Aleh*, 2015 UT App 195, ¶ 18.

¶51    For the foregoing reasons, we do not disturb the district court's findings following the bench trial or its denial of Williamson's motion to arrest judgment.

CONCLUSION

¶52    The district court did not err in determining that the private search exception applied to Detective's pre-warrant viewing of files included in a CyberTipline report, nor was there clear error in its finding that Detective's material omission from his search warrant affidavit was not recklessly made. Furthermore, Williamson waived his right to notice because he failed to use the available mechanisms to obtain more information about the State's case against him, and any deprivation of his right to a preliminary hearing was cured by his subsequent conviction beyond a reasonable doubt. For these reasons, we affirm.