2026 UT App 97

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JARED LYNN TALBERT,
Appellant.

Opinion
No. 20240192-CA
Filed June 25, 2026

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 221402950

Dallas B. Young, Attorney for Appellant

Derek E. Brown and William M. Hains,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

HARRIS, Judge:

¶1      A jury convicted Jared Lynn Talbert of six counts of various sexual crimes related to actions he took toward his minor stepchild. He now appeals his convictions, raising one argument that goes to all six counts, and then raising two separate arguments that each go to only one count. First, he asserts that his trial attorney (Counsel) rendered ineffective assistance by not objecting to the admission of what Talbert characterizes as improper propensity evidence. Second, he challenges his conviction on Count 2—for forcible sexual abuse—on various grounds, all stemming from the contention that there was a variance between the acts charged in the original information and the acts proved at trial. Third, he challenges his conviction on

Count 6—for forcible sodomy—by asserting that the trial court erred in denying his motion for a directed verdict on that count. For the reasons that follow, we reject all of Talbert's arguments and affirm his convictions.

BACKGROUND[1]

¶2 Talbert married Taylor's[2] mother (Mother) when Taylor was ten years old. Taylor's relationship with Talbert didn't start out "the best," but it began to improve when the family moved into a bigger house. After living together for a few years, Mother and Talbert had a child together. Around that same time, Mother and Talbert "agree[d] that [Talbert] would basically take night duty" with the young child because Mother "was struggling with depression" and "was overwhelmed with work." During this time, Mother would take medicine to help her fall asleep, usually "around eight." As a result, Taylor would "often" spend time with Talbert in the evening, when the two would "watch funny videos" that Taylor had found.

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

2. A pseudonym. Taylor was assigned female at birth, but during the time of the events in question Taylor had begun the process of transitioning to male and had requested the use of they/them pronouns. In this opinion, when referring to Taylor, we use the pronouns that we understand Taylor prefers.

*The Abuse*

¶3 On a summer night, soon after Taylor turned fourteen, Taylor went down to Talbert's office in the family's unfinished basement to watch videos with him. Taylor sat "on his lap," which was a "newer thing" that had started happening as Taylor got older. While the two were watching the videos, Talbert "undid [Taylor's] bra and started touching" Taylor's bare breasts, and he "squished" Taylor's nipple, which "made [Taylor] uncomfortable." The touching stopped when Taylor "noticed it was [midnight]" and told Talbert it was time to go to bed. Talbert then "apologized and said that it was inappropriate of him to do that" and "told [Taylor] not to tell [Mother]."

¶4 Another night, around that same time, Talbert and Taylor were "in [Taylor's] bedroom" with the door shut, and Talbert was sitting on Taylor's bed with his back against the headboard and Taylor "on his lap" while Taylor "was telling him about a story [they] had [written]." While discussing the story, Talbert "put his hand in [Taylor's] pants and rubbed his fingers against [their] panties." "And then later he went in [the panties], and [he] put his fingers in" Taylor's vagina. This lasted for "a few minutes," then Talbert "apologized again" and told Taylor "not to tell [Mother]."

¶5 Another time, Talbert and Taylor were "on [Taylor's] bed," in the same position, with Taylor again "telling [Talbert] about [the] story." "And Talbert did the same thing, but then . . . [he] took [Taylor's] pants and underwear off and he lifted [Taylor's] hips and put his mouth" on their vagina. Taylor "didn't like how it felt" and "squirmed away," and Talbert stopped.

¶6 On another occasion, Taylor was again "telling [Talbert] about [the] story" and "he touched [Taylor] down there again," but this time he didn't "rub[] on the outside . . . . He just went in." "[A]nd like the other time," he took Taylor's pants and underwear off and put his mouth on their vagina. Taylor "rolled away, and then [Talbert] pulled [Taylor] back" and "rubbed an object" that

Taylor "assumed . . . was his thumb" from Taylor's "butt to . . . the bottom of [their] vagina." Taylor didn't see the object but later said that it "felt like skin." Taylor thought it might have been one of Talbert's fingers, but due to its size Taylor didn't think it could have been any finger other than a thumb, and Taylor "didn't feel a fingernail at all." Taylor "squirmed away" again, causing Talbert to stop, at which point Taylor "glanced at him" putting his pants "back on."

¶7 Taylor has since remembered other things happening, but Taylor doesn't remember if these occurrences were separate from those described above because the events are "all kind of mixed together." Taylor remembers Talbert "pulling" their nipple, which was "a different time" than when he "squished" their nipple. Taylor remembers one occasion when Talbert took Taylor's shirt and bra off and "kissed and bit" "[t]he top half of [their] body." Taylor also remembers "one time [when] [Talbert] . . . put his hand on [their] neck, and it was hard to breathe."

¶8 In early December of that year, Mother woke up in the middle of the night to discover that Talbert "was nowhere to be found." Then at about 3:00 a.m. she saw Talbert "come downstairs, and [she] asked where he had been, and he said he was just getting [Taylor] . . . some medicine for a cough," which felt odd to her because she didn't think Taylor "seem[ed] sick." Mother "asked how long he had been [upstairs], and he said only about 30 minutes." Talbert then reassured her "that everything was fine." But Mother checked home security cameras and discovered that Talbert had gone into Taylor's bedroom at 12:35 a.m. and had not come out until 3:00 a.m.

¶9 At that point, Mother "was panicking" and decided to call her sisters. Mother "asked them what to do," and it was decided that after Taylor woke up, Mother would ask Taylor if anything inappropriate had happened. That morning, as planned, Mother "asked [Taylor] if there was ever a time that [Talbert] was in

[their] room and [they] felt uncomfortable or weird." Taylor answered in the affirmative and "started crying." Mother then called her sisters again and told them what she heard, and she eventually decided to pack up a few things and leave the house with the kids while Talbert was still sleeping.

¶10 After Mother left the house, she called the police, who told Mother to bring Taylor to the Children's Justice Center (the CJC), which she did. There, Taylor was examined by a forensic nurse, who specifically asked Taylor to "tell [her] about what happened" the day before. Taylor stated that Talbert had not touched them with his penis the day before but that he did touch them with his hand. The nurse then asked Taylor to describe "other times" Talbert had touched Taylor, and Taylor described the time they felt the object that "could have been his thumb." When the nurse asked if the object "could . . . have been his penis," Taylor answered affirmatively. In connection with the examination, Taylor disclosed much of the abuse described above. The nurse "performed a physical exam" but did not find any "abnormalities," which the nurse did not consider surprising because that was the case "over 90 percent of the time."

¶11 While Taylor was being examined, Mother started receiving text messages from Talbert that she considered "suicidal." Among other things, Talbert wrote to Mother, "Tell the kids that I might not have been the man that they deserved but I tried my best and I hope they have at least one good memory of me." And Talbert texted Taylor, "I'm sorry I wasn't who you needed me to be. Forever in my heart." Officers went to the house to intervene, where they convinced Talbert "to put away [a] gun" he had retrieved. The officers then asked Talbert if there was any truth to Taylor's allegations, and he said there wasn't.

*The Charging Document*

¶12 The State eventually charged Talbert with six sexual crimes: two counts of object rape (Counts 1 and 3), one count of

forcible sexual abuse (Count 2), and three counts of forcible sodomy (Counts 4, 5, and 6). The information included a probable cause statement that offered additional detail related to each count. Count 2 and Count 6 are particularly relevant here.

¶13    For Count 2, the information alleged that Talbert had committed forcible sexual abuse by touching Taylor's "pubic area" or "any part of [their] genitals." The probable cause statement recounted that Talbert had "crawled into [Taylor's] bed and rubbed [their] vagina over [their] clothing while [they were] telling him more about [their] story (COUNT 2)."

¶14    For Count 6, the information alleged that Talbert had committed forcible sodomy by "engag[ing] in [a] sexual act . . . involving the genitals of one person and the mouth or anus of another." And the probable cause statement alleged as follows:

> [Talbert] took his pants off and [Taylor] could feel his penis rubbing [their] vagina all the way to [their] anus. [Taylor] felt [Talbert] rub his penis on both [their] vaginal and anal openings . . . . [Taylor] pushed [Talbert] off of [them] and saw him pull up his pants. [Taylor] disclosed another time when [Talbert] took off [their] pants, held [Taylor] up and started licking [their] vagina . . . .[3]

*Pretrial Proceedings*

¶15    At a hearing well before trial, the court informed Talbert of his "right to have a preliminary hearing to hear the evidence." Talbert stated that he understood and, so advised, he made the

---

3. Count 6 went to the jury as being supported by the "penis to anus" incident. Talbert does not contend that this prosecutorial election was erroneous. For clarity, we refer to Count 6 only as it relates to that incident.

decision to waive his right to a preliminary hearing. He was thus bound over for trial on all charges.

¶16 About a month before trial, the State submitted proposed jury instructions to the court. In one proposed instruction (the Information Instruction), the State included most of the text of the charging document and, for Count 2, quoted the original information's language that Talbert stood accused of "touch[ing] [Taylor's] pubic area, or any part of [their] genitals." But in other proposed instructions contained in the same packet, the State proposed to offer the jury other alternatives for Count 2, including that Talbert had "touched [Taylor's] breast" and had taken "indecent liberties with" Taylor. The State proposed offering these same alternatives in a special verdict form for Count 2.

¶17 On the first day of trial, the court and the attorneys discussed the jury instructions. In particular, the court asked Counsel if he had any objection to the proposed Information Instruction, and Counsel indicated that he did not. A few minutes later, the prosecutor stated that "in looking over" the Information Instruction, he had noticed that its description of Count 2 mentioned only genital touching and "omit[ted] 'breasts of a female,'" which he also noticed was inconsistent with some of the other proposed instructions. The court and the parties discussed the matter, and eventually the State asked the court to amend the Information Instruction "to add 'or breasts of a female' in the text." Counsel stated that he had "[n]o objection," and the court granted the State's motion. When the Information Instruction was eventually read to the jury, it included the additional text. That is, the jury was told that, on Count 2, Talbert stood accused of "touch[ing] the pubic area or any part of the genitals of another *or the breast of a female*." (Emphasis added.)

*Trial*

¶18 At trial, the State presented evidence from Mother, Taylor, Taylor's father, Mother's sister, an expert on DNA analysis, the

nurse from the CJC, and an officer who interviewed Talbert at his house. These witnesses testified consistently with the events recounted above. The State also presented video evidence from the officer's body camera, which had captured the officer's interview with Talbert in its entirety.

¶19    At the close of the State's evidence, Counsel moved for a directed verdict. Counsel's motion and argument, in its entirety, was as follows:

> Well, for purposes of establishing a record, we'd move for a directed verdict at this point, and also understanding the—I would say likelihood of it being granted, I'll leave it at that.

The court denied the motion, offering its view that "there [was] some competent evidence for each of the charges in the case that have been presented so far here in the trial."

¶20    Talbert then testified in his own defense, denying all allegations of sexual abuse and stating that he felt like he had been falsely accused. He explained that on the early December day in question, he and Taylor had had a "falling out" "regarding [Taylor's] desire to transition to a male," "which [Talbert] fervently rejected from a financial standpoint." Talbert explained that this dispute had made Taylor "upset," and he suggested that it may have led to their leveling accusations of abuse against him.

¶21    Before the final instructions were read to the jury, Counsel and the State stipulated to the language of the elements instructions as well as to the language of the special verdict form for Count 2. In that same exchange, Counsel and the State also stipulated to providing the jury with a special verdict form for Count 6, in which the jury would be given the option of finding Talbert guilty of a lesser-included offense (forcible sexual abuse) instead of forcible sodomy. The court then read the stipulated instructions to the jury.

¶22   In the State's closing argument, the prosecutor emphasized the significance of Taylor's testimony and tied specific instances of abuse to the charged counts. As relevant here, the State asked the jury to convict Talbert on Count 2 based on the first-described instance of abuse, when Taylor was in Talbert's office and he "touch[ed] [Taylor's] breasts." For Count 6, the State asked the jury to convict Talbert for the "penis to anus" incident. In Counsel's closing argument, he argued that Taylor had not been a credible witness and emphasized the lack of corroborating evidence to support Taylor's claims.

¶23   After deliberation, the jury found Talbert guilty as charged on Counts 1 through 5. On Count 2, the jury found that Talbert had committed forcible sexual abuse by touching Taylor's breast but not by touching Taylor's genitals. And on Count 6, the jury acquitted Talbert of forcible sodomy, but it found him guilty of the lesser-included offense of forcible sexual abuse.

ISSUES AND STANDARDS OF REVIEW

¶24   Talbert now appeals his convictions, and he asks us to consider three issues.[4] First, he asserts that Counsel rendered ineffective assistance by not objecting to the admission of evidence of uncharged acts of abuse. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (cleaned up).

¶25   Second, Talbert argues that several errors related to Count 2 warrant reversal of his conviction on that count. All of the

---

4. In his initial brief, Talbert raised an additional issue: that Counsel had rendered ineffective assistance by opting not to object to certain testimony that Talbert characterized as improper bolstering. But in his reply brief, Talbert withdrew this argument. Accordingly, we need not address it.

issues Talbert raises regarding Count 2 arise for the first time on appeal, and when an "issue arises for the first time here on review, our decision is not governed by any standard of review, and we decide the matter as a question of law in the first instance." *Grewal v. Junction Market Fairview, L.C.*, 2024 UT 20, ¶ 12, 554 P.3d 863 (cleaned up); *see also State v. Young*, 2014 UT 34, ¶ 5, 337 P.3d 227 ("Challenges to subject matter jurisdiction present questions of law, which we review for correctness." (cleaned up)); *State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416 ("Claims for plain error and ineffective assistance of counsel present questions of law, which we determine in the first instance as a matter of law.").

¶26 Third, Talbert challenges the court's denial of his directed verdict motion regarding Count 6. "We review the [trial] court's denial of a motion for directed verdict for correctness." *State v. Dever*, 2022 UT App 35, ¶ 29, 508 P.3d 158 (cleaned up).

ANALYSIS

I. Evidence of Uncharged Acts

¶27 Talbert first argues that Counsel provided ineffective assistance by not objecting to Taylor's testimony about certain uncharged acts of abuse. He asserts that this testimony was inadmissible, pursuant to rule 404(b) of the Utah Rules of Evidence, because it didn't directly concern any of the charged events and because it raised the possibility of Talbert's character being improperly "impugn[ed]" in the eyes of the jury. Specifically, he faults Counsel for not objecting to Taylor's testimony about the "under-the-clothing breast touching incident," the "breast fondling incident where [Talbert] allegedly pulled [Taylor's] nipple," and the "breast kissing/biting incident." In response, the State argues that competent counsel could have chosen to "reasonably forgo an objection" because counsel could have reasonably believed that rule 404(b) would not have barred

this testimony and that, therefore, an objection grounded in that rule would have been overruled. We agree with the State.

¶28 "To demonstrate ineffective assistance, a defendant must make a two-part showing." *State v. Broadwater*, 2024 UT App 184, ¶ 34, 562 P.3d 739, *cert. denied*, 564 P.3d 959 (Utah 2025). First, "the defendant must show that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, "the defendant must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* A defendant must prove both elements to be successful. *See id.* And if a claim is infirm under one of the prongs, then "the claim fails and the court need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031. We choose to resolve this claim under the deficient-performance element.

¶29 To demonstrate deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *State v. Popp*, 2019 UT App 173, ¶ 26, 453 P.3d 657 (cleaned up). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. And the "failure to raise futile objections does not constitute ineffective

assistance of counsel." *State v. Samora*, 2021 UT App 29, ¶ 42, 484 P.3d 1206 (cleaned up).

¶30 Rule 404(b) prohibits admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). This rule "does not apply to evidence of the crime charged, because such evidence does not implicate a person's purported propensity to act in conformance with the character exhibited by the evidence." *State v. Blackwing*, 2025 UT 60, ¶ 29, 582 P.3d 829. Accordingly, this rule operates to exclude only "evidence that is *extrinsic* to the crime charged." *Id.* ¶ 24 (cleaned up). Evidence that is *intrinsic*—that is, evidence that has "a direct relationship between the act and the charged crime"—is "outside the scope of rule 404(b)." *Id.* ¶ 31. Thus, evidence of uncharged acts is admissible if it "is directly connected to the factual circumstances of the [charged] crime and provides contextual or background information to the jury." *Id.* ¶ 26 (cleaned up). In particular, "evidence of uncharged sexual conduct against the same child victim that is directly connected to the factual circumstances of the charged crime and provides contextual or background information to the jury is admissible— as intrinsic evidence—because showing how the perpetrator groomed the victim bears directly on the charged sexual offense." *State v. Newberry*, 2026 UT App 2, ¶ 47, 584 P.3d 343 (cleaned up).

¶31 Here, Counsel could have reasonably concluded that the uncharged sexual acts Taylor described at trial were directly related to the factual circumstances of the charged crime and that evidence of those acts was therefore not barred by rule 404(b). Taylor's testimony about the "under-the-clothing breast touching incident," the "breast fondling incident where [Talbert] allegedly pulled [Taylor's] nipple," and the "breast kissing/biting incident" describes the exact type of contextual or background evidence that we have previously found to be admissible intrinsic evidence beyond the scope of rule 404(b). *See id.* ¶¶ 47, 52. And as in

*Newberry*, the evidence of each of these instances bears directly on the charged offenses by providing circumstantial evidence of Talbert's grooming process with Taylor. Thus, Counsel could have reasonably concluded that any rule 404(b) objection to the challenged evidence would have failed, and Counsel therefore did not perform deficiently by not lodging such an objection.

## II. Count 2

¶32   Next, Talbert raises several arguments aimed at challenging his conviction on Count 2, a count on which the jury convicted him of forcible sexual abuse. At root, Talbert's objection is that the specific acts set forth in the charging document as being connected to this charge were different from the acts the jury ultimately convicted him of committing.

¶33   As a reminder, the original information alleged that, for Count 2, Talbert had committed forcible sexual abuse by touching Taylor's "pubic area" or "genitals." And in the probable cause statement that accompanied the original information, the State claimed that the act underlying Count 2 was an occasion on which Talbert "crawled into [Taylor's] bed and rubbed [their] vagina over [their] clothing while [they were] telling him more about [their] story." By contrast, the court's instructions gave the jury the option of convicting Talbert on Count 2 for either touching Taylor's genitals *or* touching Taylor's breasts. And the State's prosecutorial election during trial specified that the act underlying Count 2 was the first occasion Taylor described—the one in which they said Talbert touched their breasts while the two were in Talbert's basement office.

¶34   Talbert argues that these differences constitute a "variance" between the acts charged and the acts proved, and he asserts that this variance led to a host of problems, any of which requires reversal of his conviction on Count 2. First, he contends that this variance created a subject-matter-jurisdiction problem that renders his conviction void. Second, he contends that the

variance created procedural-due-process and notice problems that entitle him to a new trial. And third, he asserts that this variance created a problem of proof, contending that the State did not present sufficient evidence to support a conviction regarding the Count 2 acts it alleged in the charging document.

¶35 In response, the State contests Talbert's arguments on their merits, but it also raises three threshold issues. First, the State contends that the original information was "effectively amended," which eliminated any variance between the charging document and the acts discussed at trial. Second, the State asserts in its brief that, by not asking for the trial to be continued, Talbert waived the right to complain about any variance. And third, the State notes that Talbert failed to raise any of these issues for consideration by the trial court, and on this basis it asserts that all of Talbert's complaints other than subject matter jurisdiction— which, as discussed below, can be raised at any time—are unpreserved for our review on appeal.

¶36 We begin by addressing the State's first threshold argument that the charging document was effectively amended, and we conclude that it was not. Next, we address Talbert's assertion that the variance created a subject-matter-jurisdiction problem, and we conclude that it did not. After that, we address the extent to which Talbert's arguments were waived by his failure to seek a continuance of the trial, and we conclude that all but one of Talbert's arguments were waived in this way. Finally, we address the unwaived issue: the one concerning the sufficiency of the evidence on Count 2. We first conclude that Talbert failed to preserve this claim, and we then proceed to review it for plain error and to address it through the lens of Talbert's argument that Counsel rendered ineffective assistance by not asking for a directed verdict on Count 2. Ultimately, we reject Talbert's arguments.

A.    Amendment of the Information

¶37    We first address the State's contention that the information was effectively amended. After all, if this contention were correct, then there would be no variance between the acts alleged in the information and the acts proven at trial, and all of Talbert's Count 2 arguments would fail. But this contention is not correct.

¶38    Indeed, the State acknowledges that "no formal [a]mended [i]nformation" was ever "filed on the docket." It nevertheless argues that the information was "effectively amended" when Talbert agreed, during the jury instruction conference, "that the court could include breast touching" in the Count 2 jury instructions, including the Information Instruction. The State's argument has some force; after all, when the court described the pending charges to the jury, it recited that, on Count 2, Talbert stood accused of "touch[ing] the pubic area or any part of the genitals of another *or the breast of a female*." (Emphasis added.)

¶39    But in our view, amendments to charging documents need to be consciously made, by order or consent of the court. "It is a fundamental principle of criminal law that a defendant is entitled to know 'the nature and cause of the accusation against him [or her].'" *State v. Bush*, 2001 UT App 10, ¶ 14, 47 P.3d 69 (quoting Utah Const. art. I, § 12). Indeed, "[i]n a criminal proceeding[,] the accused is entitled to be charged with a specific crime so that he [or she] may know the nature and cause of the accusation against him [or her]," and "the State must prove substantially as charged the offense it relies upon for conviction." *State v. Schroeder*, 2023 UT App 57, ¶ 24, 531 P.3d 757 (cleaned up). In Utah, criminal cases are initiated by the filing of an information. *See* Utah R. Crim. P. 4(a). And once filed, an information may be amended only if certain requirements are met. *See id.* R. 4(d). Most fundamentally, an information may be amended only if the court allows it. *See id.*

¶40    Here, no party even asked the court to amend the actual information (as opposed to the Information Instruction). The

entire discussion took place in the context of discussing jury instructions, and while the State did ask the court to "amend *that* to add 'or breasts of a female' in the text" (emphasis added), in context the emphasized antecedent refers to the Information Instruction and not to the charging document itself. Thus, not only was no formal amended information filed in the docket, no party even asked the court to amend the information, and the court at no point ordered any such relief.

¶41 The situation might be different if, say, the court had made an oral ruling allowing amendment of the information but, due to a clerical error or oversight, the document was never actually filed. At least there—as in *Fahrni v. State*, 473 S.W.2d 486, 502 (Tex. App. 2015), where "the district clerk filed a supplemental clerk's record containing [an] amended indictment," even though no formal amendment was ever filed—we would have some indication in the record that the court had considered the issue and had actually ordered that the information be amended. But we think it stretches informality too far to hold that, merely by amending certain jury instructions and without actually considering any request to amend the information, a court has "effectively amended" the information itself.

¶42 For these reasons, we reject the State's argument that the information was "effectively amended" through alteration of the proposed jury instructions, including the Information Instruction.

B.    Subject Matter Jurisdiction

¶43 Next, we address Talbert's argument that the trial court "never acquired subject matter jurisdiction over the under-the-clothing breast touch incident, because it was not mentioned in the [i]nformation." We are unpersuaded.

¶44 "A court has subject matter jurisdiction if the case is one of the type[s] of cases the court has been empowered to entertain by the constitution or statute from which the court derives its

authority." *State v. Smith*, 2014 UT 33, ¶ 18, 344 P.3d 573 (cleaned up). This case—a criminal case alleging that Talbert has committed a felony crime—is unquestionably "one of the type[s] of cases" that the trial court was "empowered to entertain." *See id.*

¶45　"Section 78A-5-102(1) of the Utah Code grants district courts broad subject matter jurisdiction over criminal cases." *Id.* ¶ 20. That statute provides district courts with "original jurisdiction in all matters civil and criminal," "except as otherwise prohibited by the Utah Constitution or by statute." Utah Code § 78A-5-102(1). In application of that authority, rule 4(a) of the Utah Rules of Criminal Procedure allows the State to commence an action by filing an information.

¶46　In light of these authorities, Talbert acknowledges that because "the State filed a criminal information," the "trial court had subject matter jurisdiction over *something*." (Emphasis added.) But Talbert contends that the jurisdictional inquiry is granular: he argues that "the subject matter jurisdiction a criminal information confers begins and ends with what is alleged in the information" and that because the breast-touching incident was not specifically mentioned in the information, the trial court "had no authority over" the breast-touching incident. As he sees it, with regard to Count 2, the court had jurisdiction over only the genital-touching incident and not the breast-touching incident.

¶47　This argument fails because the subject-matter-jurisdiction inquiry is not that granular. Once an information is properly filed—in the right court by the proper prosecuting entity—a trial court has subject matter jurisdiction over the entire case, *see Smith*, 2014 UT 33, ¶ 18, and can proceed to adjudicate it, including by making any rulings the court might be asked to make regarding any alleged variance, such as rulings on motions raising, for instance, concerns grounded in due process, notice, or sufficiency of the evidence. Such concerns may, in some cases, ultimately

prove problematic, but the issues they present do not implicate subject matter jurisdiction.

¶48 Talbert resists this conclusion by directing our attention to *Natalie R. v. State*, 2025 UT 5, 567 P.3d 550, and arguing that there is another component—aside from simply asking whether the case is among the class of cases the court is empowered to entertain—to the subject-matter-jurisdiction inquiry: questions about justiciability. The court in *Natalie R.* did indeed clarify that "subject-matter jurisdiction comes in at least two stripes," the second of which "embodies concepts of justiciability." *Id.* ¶ 22 (cleaned up). Generally speaking, justiciability is concerned with situations in which there is no "justiciable controversy between adverse parties." *Id.* ¶ 23 (cleaned up). And it finds its voice in "doctrines that impose limits on [courts'] jurisdiction, including advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." *Id.* ¶ 22 (cleaned up).

¶49 But Talbert does not explain how any of these doctrines operated here to deprive the trial court of jurisdiction over the case the State filed. He does not contend that there is no justiciable controversy between adverse parties; after all, regarding Count 2, the State asserted that Talbert had committed forcible sexual abuse. And Talbert makes no effort to assert that doctrines such as mootness or ripeness are applicable here. Thus, none of the justiciability doctrines are of any assistance to Talbert in this case.

¶50 For these reasons, the trial court had subject matter jurisdiction over this case and was empowered to adjudicate the State's Count 2 allegation that Talbert had committed forcible sexual abuse. We reject Talbert's arguments to the contrary.

C. Waiver

¶51 We next address the State's contention that, by failing to ask the court for a continuance of the trial, Talbert waived his right

to complain about the alleged variance. At oral argument before this court, the State clarified its position on this point: it acknowledged that, by not asking for a continuance, Talbert did not waive his right to assert that the State had failed to present evidence sufficient to prove the allegations it made in the information, but it continued to maintain that Talbert had waived any right to complain about notice-related issues, including any argument that he was deprived of procedural due process. We agree with the State's clarified position.

¶52 The State's argument is grounded in *State v. Fulton*, 742 P.2d 1208 (Utah 1987), a case in which our supreme court flatly stated that "the failure of a defendant to seek a continuance" after discovering a potential variance "negates any claim of surprise and amounts to a waiver of any claim of variance." *Id.* at 1215–16. But that section of the opinion was dealing only with the defendant's claim that, as a result of the variance, "his constitutional right to adequate notice of the time of the alleged crime" was violated. *Id.* at 1213. Indeed, earlier in the opinion, the court addressed, on the merits, the defendant's claim that the State had failed to present sufficient evidence of the charged crime. *See id.* at 1212–13. When asked about this at oral argument before this court, the State acknowledged that *Fulton* does not support the contention that a defendant's failure to seek a continuance results in a waiver of the right to make a directed verdict motion. Thus, as clarified and narrowed at oral argument, the State's position is that Talbert's failure to seek a continuance of the trial did not result in a waiver of his right to seek a directed verdict but that it did result in a waiver of his right to complain about notice and procedural-due-process issues.

¶53 Talbert resists this position by directing our attention to *State v. Ortega*, 751 P.2d 1138 (Utah 1988), a case decided by our supreme court the year after *Fulton*. In *Ortega*, the defendant was charged with two counts of sexual abuse of a child, and at a preliminary hearing, the complaining witness testified that the

defendant had touched her inappropriately while she was under the bed and, on a different day, on a chair. *See id.* at 1138–39. At the conclusion of the hearing, the defendant was bound over for the under-the-bed incident, but "the on-the-chair incident was dismissed." *Id.* at 1140. At the subsequent trial, however, the complaining witness testified that the defendant had touched her while she was on the chair; she did not testify that the defendant had touched her while she was under the bed. *See id.* at 1139. At the conclusion of the evidence, the defendant asked the court "to dismiss the charges against him or, in the alternative, to remand the case for another preliminary hearing because the evidence adduced at trial varied from that which formed the basis of his bind over to the district court." *Id.* The court denied the motion, and the jury convicted him of sexual abuse. *See id.* On appeal, the State argued that the defendant had waived his right to complain "because he did not make his motion to remand for preliminary hearing until the close of the State's evidence." *Id.* at 1141. Our supreme court rejected this argument, finding it significant that "the trial testimony involved a criminal episode for which defendant was not bound over to the district court." *Id.*

¶54 We take Talbert's point that there may be some tension between *Fulton* and *Ortega* regarding these issues.[5] But in the end, we view *Fulton* as controlling and *Ortega* as distinguishable on multiple grounds. First, the *Ortega* court was not asked to weigh in on whether there might be consequences that flow from a defendant's failure to seek a continuance after discovering a potential variance. Indeed, in *Ortega,* the State attempted to chide the defendant not for failing to file a motion to continue but, instead, for filing an *untimely* motion to remand for a preliminary

---

5. Largely on this basis, we asked our supreme court to recall this case so that it could provide guidance on how to interpret and harmonize *Fulton* and *Ortega.* The supreme court declined to do so, and thus we offer here our best assessment of how those cases might align.

hearing. *See id.* The *Ortega* court simply has little to say about whether there are waiver-related consequences for a defendant who fails to file a motion for a continuance in this context.

¶55   Second, as we pointed out in *State v. Williamson*, the holding in *Ortega* was, at least in significant part, reliant on since-repealed constitutional language regarding the role of preliminary hearings. *See* 2024 UT App 141, ¶¶ 46–48, 558 P.3d 143 (noting *Ortega*'s reliance on article I, section 12 of the Utah Constitution, a provision that was amended after *Ortega* to "effectively overrule[] that portion of any case that expressly or implicitly held that a request for a preliminary hearing is one way in which a defendant may effectuate the right to notice"), *cert. denied*, 568 P.3d 263 (Utah 2025). Indeed, we held in *Williamson*, after analyzing *Ortega*, that a defendant who failed to request a bill of particulars or otherwise "mak[e] a demand for the date, place, and time of the alleged offense" had "waived his [or her] constitutional right to adequate notice" regarding the particulars of the pending charges. *Id.* ¶ 48.

¶56   For these reasons, we view *Fulton* as controlling law on this point. Under the principles announced in that case, a defendant's failure "to seek a continuance negates any claim of surprise" regarding any variance between the acts alleged in the information and the acts proven at trial, including any complaints related to notice or procedural due process. *See Fulton*, 742 P.2d at 1215–16; *see also State v. Wilcox*, 808 P.2d 1028, 1032 (Utah 1991) ("[I]f a defendant fails to request a bill of particulars or make demand for the date, place, and time [of the offense] . . . and a response to either of these would have cured the claimed deficiency, then he or she will be deemed to have waived the constitutional right to adequate notice."). But any such failure does not result in a waiver of a defendant's right to seek other potential remedies to a variance problem, including asking for a directed verdict or otherwise challenging the sufficiency of the evidence presented by the State.

¶57    In this case, Talbert did not seek a continuance as a remedy for the variance problem. And Talbert does not argue on appeal that Counsel rendered ineffective assistance by failing to do so. Accordingly, under *Fulton*, Talbert has waived any right to complain about notice-related issues, including any claims that the variance impaired his right to procedural due process. We therefore do not address the merits of those claims.

¶58    However, Talbert's failure to seek a continuance did not result in any waiver of other potential remedies Talbert might have sought. In particular, and as relevant here, Talbert has not waived his right to challenge the sufficiency of the evidence.

## D.    Sufficiency of the Evidence

¶59    We therefore turn to Talbert's unwaived claim: that the State failed to actually prove the specific act it alleged in the information. In particular, he argues that the trial court erred when it denied his motion for a directed verdict on Count 2 because the State presented "no evidence at all of the offense charged in the [i]nformation," namely, the allegation that Talbert touched Taylor's genitals on an occasion in which he "crawled into [Taylor's] bed and rubbed [their] vagina over [their] clothing while [they were] telling him more about [their] story."

¶60    The State's initial response to Talbert's argument on this point is to assert that the argument is unpreserved for appellate review. Thus, we first address the State's preservation contention and then turn to the merits of Talbert's argument.

### 1.    Preservation

¶61    The State acknowledges that Counsel did make a directed verdict motion. But it argues that Counsel's motion was brief, generic, and half-hearted, and it posits that this "generic motion . . . was not specific enough to preserve [Talbert's] variance claim." In response, Talbert recognizes that Counsel "could have

fleshed the arguments out more," but he still claims that the motion was specific enough because "the State understood that the motion was for all counts" and because the State "opposed the motion by citing evidence it believed was enough to get each count to the jury." In our view, the State has the better argument.

¶62    "Appellate courts generally will not consider an issue unless it has been preserved for appeal." *State v. Skinner*, 2020 UT App 3, ¶ 23, 457 P.3d 421 (cleaned up). "To preserve an issue for appeal, a party must present it to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Id.* (cleaned up). "To provide the court with this opportunity, the issue must be specifically raised [by the party asserting error], in a timely manner, and must be supported by evidence and relevant legal authority." *State v. Stricklan*, 2020 UT 65, ¶ 127, 477 P.3d 1251. "A directed verdict motion that makes general assertions but fails to assert the specific argument raised on appeal is insufficient to preserve the more specific argument for appeal." *Skinner*, 2020 UT App 3, ¶ 23 (cleaned up). Indeed, in a related context, we have held that "[a] generalized challenge to the sufficiency of the State's evidence . . . does not necessarily include an assertion that any particular witness's testimony is 'inherently improbable.'" *Id.* ¶ 25. A specific argument like that "may be a component of an insufficiency challenge, but not every insufficiency challenge raises" such specific arguments. *Id.* (cleaned up).

¶63    In this case, Counsel's motion for a directed verdict was strikingly spare, stating in its entirety as follows:

> Well, for purposes of establishing a record, we'd move for a directed verdict at this point, and also understanding the—I would say likelihood of it being granted, I'll leave it at that.

Counsel did not provide any supporting evidence or relevant legal authority. And Counsel offered no indication that, as part of his motion, he wanted to raise a variance-related objection and

have the court analyze whether the evidence presented at trial matched the specific acts alleged in the information's probable cause statement.

¶64 In responding to the motion, the State made a brief argument that included reference to evidence presented at trial that the State believed supported each count. As relevant to Count 2, the prosecutor argued that Taylor had "testified that [Talbert] touched [their] breasts on . . . at least two occasions." Counsel did not respond to the State's argument. And the State's points were supported by evidence in the record: Taylor had indeed testified that Talbert had touched their breasts on at least two occasions.

¶65 An issue is preserved "[w]hen the specific ground for an objection is clear from its context." *State v. Gonzalez*, 2015 UT 10, ¶ 26, 345 P.3d 1168. Stated another way, the party raising the objection must raise the relevant issue "to a level of consciousness before the trial court such that the court has an opportunity to rule on it." *State v. Centeno*, 2023 UT 22, ¶ 54, 537 P.3d 232 (cleaned up). That standard is not met here. Under these circumstances, and especially in light of the fact that all parties had agreed to amend the Information Instruction to indicate that Count 2 also covered breast touching, the trial court had no reason to believe that Counsel's vague directed verdict motion was asking it to engage with a variance-related objection. We therefore conclude that the specific legal theory Talbert raises here on appeal—that a directed verdict should have been granted due to a variance—was not presented to the district court and therefore was not properly preserved for our review.

¶66 We can, however, review even unpreserved issues on appeal, but we must do so through the lens of one of our established exceptions to the preservation rule. *See State v. Beverly*, 2018 UT 60, ¶ 22, 435 P.3d 160 (describing "three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances" (cleaned up)). Here,

Talbert asks us to review this unpreserved issue under two of those exceptions: plain error and ineffective assistance of counsel. We address each invoked exception in turn.

2.     Plain Error

¶67     "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Carrera*, 2022 UT App 100, ¶ 22, 517 P.3d 440. Evidence is insufficient when it "is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *Id.* ¶ 29 (cleaned up). And where a "defendant is claiming plain error in relation to his [or her] sufficiency of the evidence challenge, the defendant must also show that the insufficiency was so obvious and fundamental that the [trial] court erred in submitting the case to the jury." *Id.* (cleaned up). Here, given the circumstances, Talbert cannot make that showing.

¶68     Recall that the parties, on the first day of trial, both agreed that the Information Instruction could be amended "to add 'or breasts of a female' in the text." And when that instruction was read to the jury less than two hours later, it included the additional text. That is, at the outset of the trial, the jury was told that, on Count 2, Talbert stood accused of "touch[ing] the pubic area or any part of the genitals of another *or the breast of a female*." (Emphasis added.)

¶69     It was against this backdrop that Counsel made his brief directed verdict motion. Given the way the case had unfolded, the court simply wouldn't have been thinking that there was any dispute about whether the evidence matched the allegations contained in the information. And Counsel gave no indication that his motion intended to raise that legal theory. Under these circumstances, any error on the trial court's part was far from

obvious, and Talbert's plain error claim therefore fails on the second element.

3.      Ineffective Assistance of Counsel

¶70    Talbert also asserts that Counsel rendered constitutionally ineffective assistance by not making a proper directed verdict motion that would have informed the trial court that Counsel was asking it to grapple with a potential variance issue. We have already set out what the standards are for succeeding on such a claim. *See supra* ¶¶ 28–29. Here, Talbert's ineffective assistance claim fails because Talbert has not demonstrated that Counsel performed deficiently in this regard.

¶71    At first blush, Talbert's argument appears to have some force. After all, if the State has failed to prove what it said it was going to prove in the information, a defendant might have a strong argument for a directed verdict. It would certainly not have been unreasonable for Counsel to have made a more specific directed verdict motion that would have required the court to reckon with the asserted variance issue.

¶72    But in our view, and on this particular record, it was also not constitutionally unreasonable for Counsel to opt not to do so. This is so for two related reasons, both having to do with how the State would likely have reacted to Counsel making such a motion.

¶73    First, the State could have responded to the motion by altering its prosecutorial election regarding Count 2. During closing argument, the prosecutor asked the jury to convict Talbert of forcible sexual abuse on Count 2 based on Taylor's first described instance of abuse, when Taylor was in Talbert's office and he "touch[ed] [Taylor's] breasts." This election was consistent with the stipulated amendment to the jury instructions, in which the parties agreed that Count 2 could include a possible breast touch. However, as Talbert now points out on appeal, this election was inconsistent with the acts described in the information and its

probable cause statement for Count 2, in which the State accused Talbert of committing forcible sexual abuse by touching Taylor's "pubic area" or "genitals" on an occasion in which he "crawled into [Taylor's] bed and rubbed [their] vagina over [their] clothing while [they were] telling him more about [their] story."

¶74 But as the State points out, there was some evidence, introduced through Taylor's trial testimony, indicating that Talbert touched Taylor's pubic area or genitals on other occasions that weren't covered by the other charged counts. While Taylor's testimony was not entirely express on this point, the State asserts that a factfinder could have drawn reasonable inferences from this evidence sufficient to support a conclusion that Talbert had in fact touched Taylor's genitals. The State also maintains that a competent attorney could reasonably believe that the evidence supported this conclusion and, thus, reasonably opt not to raise the variance issue, knowing that the State could simply alter its prosecutorial election regarding Count 2 in response and focus the jury's attention on the other incidents of genital touching.

¶75 After a review of the record, we find the State's position persuasive. Taylor testified that, on one occasion, Talbert "put his hand in [their] pants and rubbed his fingers against [their] panties," and that later on that same occasion Talbert "went in [the panties]" and "put his fingers in down there." While the digital penetration Taylor described qualified as the basis for one of the object rape counts, the State posits that Taylor's associated testimony—that, before the digital penetration, he touched them "against [their] panties"—could qualify as a potential basis for a finding of forcible sexual abuse. And for context, the State points to another part of Taylor's testimony in which Taylor stated that, on a different occasion, Talbert "put his hand in [their] pants and touched [them] again" but that this time he didn't "rub[] on the outside" first, "[h]e just went in."

¶76 Talbert, in response, asserts that the cited testimony is not clear enough as to whether Talbert actually touched Taylor's genitals; in particular, he posits that Taylor's testimony that Talbert touched the panties is not close enough. We disagree. Especially in context, a factfinder could quite easily infer that the touching of Taylor's underwear described in the testimony included an over-the-clothing touch of the genitals. At the very least, a reasonable attorney could have thought so.

¶77 Talbert also maintains that these other incidents of genital touching cannot fix the variance problem, because—as Taylor described them—they did not occur on the bed while Taylor was telling Talbert about their story (as the information's probable cause statement recites). Even so, the information itself (as opposed to the probable cause statement) referenced simply a touching of the "pubic area" or "genitals," and it is well-settled that time is generally not an element of a criminal offense. *See State v. Fulton*, 742 P.2d 1208, 1213 (Utah 1987) ("[T]he time an offense [i]s committed is generally not an element which the prosecution must prove at trial."). Counsel could therefore have reasonably believed that there was no variance problem between the evidence presented about this additional over-the-clothing genital touch and the allegations set forth in the information.

¶78 Second, the State could alternatively have responded to a more fulsome directed verdict motion by making a motion of its own, pursuant to rule 4(d) of the Utah Rules of Criminal Procedure, asking the court to actually amend the information to include breast touching in Count 2. That rule allows a court to "permit an information to be amended after the trial has commenced but before verdict" if two conditions are met: (1) "no additional or different offense is charged" in the amended information and (2) "the substantial rights of the defendant are not prejudiced." Utah R. Crim. P. 4(d). On this record, a competent defense attorney could have reasonably concluded that such a motion by the State would have been granted.

¶79 Regarding the first element, a reasonable attorney may have been aware of *State v. Peterson*, 681 P.2d 1210 (Utah 1984), a case in which our supreme court held that as long as the same criminal statute was invoked and the same crime charged, a midtrial amendment did not allege an additional or different offense even where it invoked a different subsection of that same statute. *See id.* at 1220–21 (noting that the amendment "did not change the basic charge" and used the same statutory "Title and Section" as the original information). In this situation, where the charge would have remained the same—both the original information and the putative amended one accused Talbert of committing forcible sexual abuse, in violation of Utah Code section 76-5-404—a reasonable attorney could have believed that, pursuant to *Peterson*, the first element of rule 4(d) was satisfied.

¶80 As to the second element, Counsel would have known, at the outset of the trial, that all parties had agreed that the jury instructions—including the Information Instruction—could be amended to indicate that Talbert could be convicted, on Count 2, for either genital touching or breast touching. At the time that instruction was amended, Counsel made no argument that Talbert's substantial rights were violated by the change. And we note that Talbert's primary defense—that Taylor had fabricated the allegations in retaliation for Talbert's lack of cooperation with their efforts to transition to male—was equally applicable to both genital touching and breast touching. *See State v. Whitefeather*, 2026 UT App 81, ¶ 27 (noting that the "primary defense was available under either pathway," a fact that cut against the defendant's argument that his substantial rights had been violated by an amendment to the information). In short, Counsel could reasonably have believed that he would be unable to convince the court that Talbert's substantial rights would be violated by an amendment of the information.

¶81 For any of these reasons, then, Counsel could have reasonably determined—on this record—that making a more

detailed directed verdict motion would have been an exercise in futility and would ultimately not have benefitted Talbert. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)). Accordingly, Talbert has not met his burden of demonstrating that Counsel performed deficiently by not making such a motion.

¶82 In sum, we find none of Talbert's arguments regarding Count 2 to be persuasive. We therefore affirm Talbert's conviction on Count 2.

### III. Count 6 Directed Verdict

¶83 Finally, Talbert argues that "the trial court erred in denying the motion for directed verdict on Count 6," the count involving the "penis-to-anus" incident in which Taylor testified that Talbert touched their body, with one of his body parts that could have been his penis, from their anus to their vagina. On that count, Talbert was charged with forcible sodomy, a charge that requires the State to prove that the incident involved the "genitals" of one of the participants and the "mouth or anus" of the other. *See* Utah Code § 76-5-403(1). Talbert asserts that the State presented insufficient evidence that his penis was involved in the incident in question. In response, the State first asserts that the record contains sufficient evidence to support a reasonable inference that, during the charged incident, Talbert used his penis—rather than another body part—to touch Taylor's body, including their anus. Second, the State points out that the jury *acquitted* Talbert of forcible sodomy and convicted him only of the lesser-included offense of forcible sexual abuse, a crime that does not require evidence that Talbert used his penis. We agree with the State on both counts.

¶84 First, there was sufficient evidence to support a factual determination that Talbert used his penis to touch Taylor during the "penis-to-anus" incident. At trial, Taylor testified that Talbert "rubbed an object" that Taylor "assumed . . . was his thumb" from Taylor's "butt to . . . the bottom of [their] vagina." Taylor testified that they didn't see the object. Taylor explained that it "felt like skin" and might have been one of Talbert's fingers, but they "didn't feel a fingernail at all" and, due to the object's size, they didn't think it could have been any finger other than a thumb. And after the incident, Taylor saw Talbert putting his pants back on. Later in the trial, the jury heard clarifying evidence about this incident from the nurse who examined Taylor at the CJC. During that examination, Taylor described the time they felt the object that "could have been his thumb," and when the nurse asked if the object "could . . . have been his penis," Taylor answered affirmatively.

¶85 "On a sufficiency of the evidence claim we give substantial deference to the jury, and a sufficiency of the evidence inquiry ends if there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made." *State v. Pierce*, 2022 UT 22, ¶ 32, 511 P.3d 1164 (cleaned up). Applying this standard, and after examining the evidence presented at trial, we conclude that sufficient evidence existed upon which the jury could have concluded that Talbert used his penis and, therefore, sufficient evidence existed upon which the jury could have convicted Talbert of forcible sodomy. Although Taylor testified at trial that they didn't see the object and assumed it was Talbert's thumb, they didn't feel a fingernail and saw Talbert putting his pants back on after the incident. The jury also heard the clarifying comments Taylor made during the CJC examination, where Taylor told the examining nurse that the object could have been Talbert's penis. On this record, it would have been fair for the jury to draw the inference that Talbert used his penis to touch Taylor during the incident in question.

¶86    But as noted, the jury didn't actually convict Talbert of forcible sodomy: it acquitted him of that charge and convicted him only of the lesser-included offense of forcible sexual abuse. And Talbert does not argue that the evidence was insufficient to support a verdict on that lesser charge. He does, however, argue that, at the time he made his directed verdict motion aimed at the forcible sodomy charge, neither side had yet asked the court to give a lesser-included-offense instruction on Count 6, and he posits that, had the court granted the directed verdict at that point, "there would have been no primary offense left on the board in which to include a lesser one."

¶87    This argument fails because—even leaving aside the question of how the State would have responded, in the moment, had it perceived that the court was inclined to grant the directed verdict motion—as already noted, the State presented sufficient evidence to support the forcible sodomy charge. For all these reasons, we reject Talbert's arguments regarding Count 6.

CONCLUSION

¶88    Talbert has not carried his burden of demonstrating that Counsel rendered ineffective assistance when he chose not to object to the admission of evidence of uncharged acts of abuse. For various reasons, we reject his challenges to his conviction on Count 2. And we likewise reject his argument that the court erred in denying the motion for directed verdict on Count 6. Accordingly, we affirm Talbert's convictions.

———————